■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NORMAN WOODWARD, JR., Appellant.—Appeal by defendant from a judgment of the County Court, Nassau County, rendered May 27, 1976, convicting him of burglary in the third degree and petit larceny, upon a jury verdict, and imposing sentence. Judgment affirmed. No opinion. Latham, J. P., Suozzi and Gulotta, JJ., concur.

Shapiro, J., dissents and votes to reverse the judgment and order a new trial, with the following memorandum, in which Cohalan, J., concurs: The defendant, Norman Woodward, Jr., and one Erroll A. Freeman were found guilty by a jury of the crimes of burglary in the third degree and petit larceny. The appeal before us is that of the defendant Woodward.

### PRELIMINARY STATEMENT

The charges stemmed from a burglary of the home of one Walter Oliver on April 29, 1975. The indictment named Woodward, Freeman and one Gregory E. Glenn as codefendants. Glenn testified against appellant and Freeman under a grant of immunity. At a *Huntley* hearing, appellant denied making the oral confession the prosecution attributed to him. The defendant Freeman did not testify and his written and signed confession of guilt was received in evidence. The hearing court ruled that both Freeman's written statement and appellant's oral confession could be admitted at the trial. Aside from seeking a reversal for errors claimed to have been committed at the trial, appellant also contends that the trial court committed constitutional error in denying him a severance. I agree with appellant on both contentions and, therefore, vote to reverse the judgment and order a new trial.

### THE FACTS

The police officers testified that they first arrested Glenn and then Freeman and obtained written confessions from both of them. They thereafter questioned appellant and he, on at least two occasions, denied any participation in or knowledge of the burglary. However, after they read him the Freeman statement he said, "Yes, that is what happened". Appellant then made a further oral confession which the officers reduced to writing, but which appellant refused to sign. Freeman's signed statement reads as follows: "My name is Erroll Freeman. I am 21 years old. I was born on March 10, 1954. I live at 36 Maple Avenue, Hempstead, New York. I live there with my wife and child, also my mother-in-law. I have no phone. I am a student at Manpower Incorporated, Hempstead, New York. I have been

told by Detective R. Gentile that I have the right to remain silent and that any statement I make may be used against me in court. I have been told that I have the right to talk with a lawyer present at any time. Further, I have been advised that if I can't afford to hire a lawyer, one will be furnished me and I have the right to keep silent until I have had the chance to talk with a lawyer. I understand my rights and make the following statement freely and voluntarily. I am willing to give this statement without talking with a lawyer or having one present. On April 29, 1975, Thursday, I was home at 36 Maple Avenue, Hempstead, with me there were my brother-in-law, Scooter Woodward, and a guy named Gregg. I don't know his last name. My mother-in-law was also there. I was saying to them I needed money for my wife and baby, for food. I was thinking of ways to get it. I said to them I was thinking about breaking into Walter's house at 62 Linden Avenue, Hempstead. I know he worked days because my mother-in-law used to live there, and I have been in Walter's home. I knew what he had in his home. Scooter agreed to break in with me. Gregg said he would go to the pawnshop and help us pawn it. My mother-in-law didn't say anything. Scooter and I left the house to go break into Walter's home. Gregg stayed at my house. We got to 62 Linden Avenue at about 12:20 P.M. We went to the back door. We both pushed the door in, we went inside and took a portable TV, Panasonic, an amplifier, a radio and we put the stuff in back of a garage. Scooter and I went back to my house and got two paper bags to put the things in. All three of us went back to the garage. Gregg, Scooter and me, we put the things in the bags. We walked back past my house. Scooter went into the house. Gregg had the TV and the radio. I had the amplifier. Both of us went to the pawnshop on Main Street, Hempstead. We went in together and pawned the things. I got $20.00 for the amplifier. Gregg got $30.00. We went back to my house and split the money. Greg didn't get any money. I got $25.00 and Scooter got $25.00. After that we went each other's way. I have read this statement. Det. R. Gentile has written in front of me and it is the truth. Any false statements made herein is *[sic]* punishable as a Class A misdemeanor pursuant to Section 210.45 of the Penal Law. [signed] Erroll Freeman 36 Maple Avenue Hempstead, NY". Prior to admitting Freeman's written statement in evidence, the Trial Judge recognized the inherent unfairness of burdening appellant with that statement, observing that it was "so prejudicial as to be unfair to [appellant]". He concluded, and in my opinion correctly, that Freeman's signed statement would carry more weight with the jury than would testimony as to appellant's alleged oral confession and he chided appellant's counsel for not having made a motion for a trial severance.* The Trial Judge then added that he would not admit the Freeman statement in evidence without redaction of appellant's alleged participation in the crime. Thereafter, upon the prosecutor's urging and the citation of *People v McNeil* (24 NY2d 550, cert den 396 US 937), *People v Burwell* (26 NY2d 331) and *People v Payne* (35 NY2d 22), the Trial Judge changed his ruling and admitted the statement in its entirety, with a limiting instruction to the jury to the effect that it was "only binding" on Freeman and that it was not to be considered "as far as Woodward was concerned in any way." The Trial Judge's final conclusion, based upon his understanding of the cases cited, was that he

---

* The court stated: "Why, frankly, Mr. Levine [appellant's counsel], you didn't make a motion for a severance when you knew about this statement, I don't know." In fact, appellant had unsuccessfully moved for a severance both before and after his *Huntley* hearing.

was, as a matter of law, compelled to admit the Freeman statement and that there should not be a trial severance because the confessions of both the appellant and Freeman were "substantially similar", although he had previously determined *as a fact* that the admission of Freeman's statement would be "so prejudicial as to be unfair to [appellant]". Freeman's statement was then read to the jury by the prosecutor. The evidence against Freeman and Glenn (the immunized defendant) was particularly strong. The complainant, whose home was burglarized, testified that when he saw his television set in a pawnshop he called the police and thereafter pointed out his set to a detective. He also identified a Bradford tape deck as one of the other items stolen from his home. He stated that he knew Freeman since the latter had visited at his home. As a result of enterprising work by the police they arrested Glenn and obtained a signed statement from him in which he implicated Freeman *(but not appellant)* in the burglary. Freeman was then taken into custody and when he was told that he had been implicated in the crime by Glenn he said, "I committed the burglary *because I needed money for my wife and child to eat.*" Thereafter Freeman told the police where he had pawned the stolen items and made and signed the confession set forth above. The pawnbroker testified that his purchase sheet showed the seller of a Bradford AM-FM receiver to be a male Negro named Erroll Freeman who lived at 61 Grove Street, Hempstead, and that the sheet was signed by Erroll Freeman. Glenn testified that he and Freeman took the stolen items to the pawnshop, that he went in first and pawned the television set and a portable radio for $30 and that the man in the pawnshop filled out a purchase slip which he, Glenn, signed. In his testimony, although admitting that Woodward never went to the pawnshop, he incriminated Woodward in the burglary and stated that, after some argument over his share of the money, he gave it to Woodward and got nothing for himself. It is thus apparent that the only proof of appellant's participation in the burglary—unbuttressed by Freeman's written statement —is appellant's alleged *oral* confession and the testimony of Glenn, upon which alone appellant could not have been convicted since Glenn was an accomplice as a matter of law as the trial court correctly ruled. Under such circumstances, with the jury deliberating for about 12 hours before coming in with a verdict, can it be doubted that Freeman's signed statement which was read to the jurors by the prosecutor during the trial, and was thereafter taken into the juryroom by them, *was the deciding straw against Woodward,* particularly when the prosecutor, over objection, was permitted to tell the jury in his summation that Freeman's statement "incriminated" Woodward in the burglary and that what Freeman said was the truth?

### THE BRUTON RULE AS MODIFIED BY MCNEIL

In *Bruton v United States* (391 US 123), the court laid down the rule that the right of a defendant to confrontation under the Sixth Amendment to the United States Constitution was violated by the admission upon trial of a codefendant's extrajudicial statement which implicated the defendant, since he had no opportunity to cross-examine the maker of the statement. The court then pointed out (p 136, n 12) that cross-examination is the method by which " 'the many possible deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light' ". Accordingly, the failure of the trial court in that case to order a trial severance was held to be constitutional error requiring a reversal and a new trial. Our Court of Appeals has limited the effect of the *Bruton* rule by holding that the "devastating risk" which

exists when there is a lack of confrontation is overcome when the complaining defendant has, himself, made a "full and voluntary" confession which is "almost identical" to his codefendant's confession *(People v McNeil, supra,* pp 552-553; *People v Burwell, supra; People v Payne, supra).* In *People v Stanbridge* (26 NY2d 1, 5), the Court of Appeals stated that it: "has not applied the *Bruton* rule where there are multiple confessions of codefendants and the complaining defendant has himself confessed, apparently because this is a safety check on the reliability of the confession". However, in this case the confessions are not "almost identical"; the codefendant's confession is in writing and is signed by him, whereas the appellant's alleged confession is oral, was preceded by at least two denials of implication in the burglary and was refused signature by the appellant after it was reduced to writing. Thus, we have here a case where there is an undisputed, detailed, three-page written confession by the codefendant Freeman, vis-à-vis an oral confession by the appellant—the existence, extent and veracity of which was the very question to be decided by the jury. The same Judge who presided at the trial in this case cogently pointed out why there should be a severance in such circumstances when, in *People v Thomas* (71 Misc 2d 1069, 1072), he said: "As to the relative weight a jury might attach to a written vs. an oral statement, we would point out that the Legislature and the courts of New York seem to find greater weight in a written statement. CPL 240.20 (subd. 1, par. [b]) gives a defendant an absolute right to discovery of any written statement he has made to law enforcement authorities. There is no such discovery right with respect to an oral statement * * * As a practical matter, jurors could conceivably attach greater weight to a signed statement placed before them in their deliberations. The testimony of a law enforcement agent as to what he remembers a defendant said in his presence, and upon which he has been cross-examined by defense counsel as to his recollection, actions, and motives, might not have the same weight as a signed confession before the jury. The 'actual effect' could be substantially different." Thus, accepting the limitations placed on *Bruton* by *McNeil* and the other cases following in its wake, it seems clear to me that on this record, even applying the *McNeil* rule, there should have been a trial severance. Here, the totality of the proof upon the trial was, in the main, directed against the defendant Freeman and the appellant was implicated in the commission of the crime only by his disputed oral confession and the testimony of the accomplice Glenn, who admitted that he was testifying in order to save himself and to retain his county job. The testimony of such an accomplice is "inevitably suspect * * * given the recognized motivation to shift blame onto others" *(Bruton v United States, supra,* p 136; *People v Duncan,* 46 NY2d 74). Thus, there is here at least " 'a reasonable possibility that the evidence complained of might have contributed to the conviction' " (see *People v Baker,* 26 NY2d 169, 174) and the judgment should be reversed and a new trial should be had.

### THE PROSECUTOR'S SUMMATION

The prosecutor's summation was deliberately designed to have the devastating proof of Freeman's indisputable guilt "rub off" on appellant. Thus, he completely neutralized the court's instruction at the time the Freeman statement was admitted in evidence by repeated exhortations to the jury to carefully examine the contents of that statement and by asking them to compare the signature on the pawn ticket with that of Freeman on his confession. Apparently fearful that the indirect approach would not be sufficiently persuasive of appellant's guilt, *the prosecutor overtly invited the*

*jury to consider the Freeman statement as direct proof against Woodward* when he proclaimed that "Mr. Freeman's statement implicated Mr. Woodward". The immediate objection taken to that statement, and particularly to the word "implicated", was answered by the court with one word, "overruled". Not content with that victory, the prosecutor proceeded to state, "The statement speaks for itself, and I believe the facts would show that Mr. Freeman's statement is the truth." Under such circumstances the court's limiting instructions, if indeed they would otherwise have had any vitality, were completely devitalized (see *People v Adams,* 21 NY2d 397; *People v Baker,* 23 NY2d 307; *People v Lombard,* 4 AD2d 666). In *People v Adams (supra,* pp 401-402), the court spoke in language which is particularly pertinent here: "Notwithstanding the court's charge and prior instruction, we are convinced that Adams was denied the fundamentals of a fair trial and, therefore, reversal is mandated. During his summation to the jury, the District Attorney, despite the Judge's instructions, urged them to accept Love's statement as evidence against Adams. While it cannot be said, as it was in *People v. Lombard* (4 A D 2d 666), that the District Attorney *exhorted* the jury to consider the inadmissible evidence, we think that the District Attorney's remarks vitiated whatever protection the Judge's instructions afforded the defendant. Under the circumstances of this case, it is unreasonable to assume that the jury could follow the court's instructions. The observation of the court in the *Lombard* case is particularly applicable here: 'The District Attorney is an advocate, but, at the same time, he is a quasi-judicial official *(People v. Fielding,* 158 N. Y. 542) and his primary duty is to see that justice is done and the rights of all—defendants included —are safeguarded. There is a positive obligation on his part to see that a trial is fairly conducted *(Berger v. United States,* 295 U. S. 78). He should be as zealous in protecting the record against reversible error as he is to present his case as forcefully as possible. While allowed the widest latitude by way of comment, denunciation or appeal in advocating his cause, this does not give him any warrant to introduce into summation matter which the jury has no right to consider in determining the guilt or innocence of the defendant' *(People v. Lombard, supra,* p. 671). Although the evidence in the record is sufficient to support the conviction, this court, as well as others, has *refused* 'to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade us of defendant's guilt' *(People v. Mleczko,* 298 N. Y. 153, 163; see, also, *People v. Steinhardt,* 9 N Y 2d 267; *People v. Jackson,* 7 N Y 2d 142; *People v. Marks,* 6 N Y 2d 67; *People v. Ochs,* 3 N Y 2d 54; *People v. Lovello,* 1 N Y 2d 436; *People v. Savvides,* 1 N Y 2d 554; *People v. Castelo,* 24 A D 2d 827; *People v. Driscoll,* 20 A D 2d 880; *People v. Copeland,* 12 A D 2d 942; *People v. Lombard, supra).* While the prejudicial remarks in the District Attorney's summation may have been made unintentionally in the heat of advocacy, the fact remains that Adams was deprived of a fair trial." (Emphasis in original.) The Court of Appeals reiterated the same views in a similar situation in *People v Baker* (23 NY2d 307, 318, *supra):* "To compound the problem, the prosecutor urged the jury to consider Hamm's statement against all the defendants. This vitiated any instructions by the trial court *(People v. Adams,* 21 N Y 2d 397, 401; *People v. Lombard,* 4 A D 2d 666)."

### CONCLUSION

Even if the trial court's denial of a severance did not violate appellant's Sixth Amendment right to confrontation, and even granting that customarily, absent the constitutional issue, the question of whether there should be

a trial severance rests in the sound discretion of the trial court (CPL 200.40), it is clear that where the trial record discloses "injustice or impairment of substantial rights *unseen at the beginning*" which stemmed from continuing with a joint trial, reversal is required (see *People v Fisher*, 249 NY 419, 427; emphasis supplied). That rule should certainly apply in this case, where the Trial Judge, at the very outset, determined that, as a matter of fact, the use of the Freeman statement was "so prejudicial as to be unfair to [the appellant]". In effect the *McNeil* exception to *Bruton* is nothing but a special harmless error rule (see, e.g., *Harrington v California*, 395 US 250, 254). Here the Trial Judge recognized the unfairness of a joint trial, but believed that he was precluded from exercising any discretion in the premises because of *McNeil*. In coming to that conclusion he was clearly in error. In this connection it is interesting to note that in *People v Payne* (35 NY2d 22, 27-28, *supra*), the court observed that a reversal is not required where there is either a statement "which is almost identical to the codefendant's" or where "the independent proof of defendant's guilt is substantial". Finally, as Chief Judge Breitel said in *People v Safian* (46 NY2d 181, 187): "Of course, it is now established law that when introduction in evidence of the extrajudicial confession of a codefendant not testifying and not subject to cross-examination adds substantial weight to the prosecution's case against another defendant, that defendant is denied his constitutional right to confrontation *(Bruton v United States*, 391 US 123, 127-128, *supra).* (See, also, *Nelson v O'Neil*, 402 US 622, 628, noting that the Supreme Court has never extended *Bruton* beyond its specific holding. The statement is still true.) The rule is based on the assumption that even when limiting instructions are given, jurors may not be capable of ignoring or willing to ignore portions of a codefendant's confession that inculpate another defendant *(Bruton v United States, supra,* esp pp 135-136)." Accordingly, there should be a reversal and a new trial as to this appellant.